Opinion for the court filed by Circuit Judge PROST.
Dissenting opinion filed by Circuit Judge RADER.
PROST, Circuit Judge.
Robert Chapman, Lonn Rider, Qi Hong, Donald Kyle, and Robert Kupper’s (“Chapman’s”) U.S. Patent Application No. 11/391,897 (“the '897 application”) and Michael Casner, Jen-Sen Dung, Erno Kesk-eny, and Jin Luo’s (“Casner’s”) U.S. Patent No. 7,153,966 (“the '966 patent”) both claim methods of preparing oxycodone that reduce the levels of a potentially toxic intermediate, 14-hydroxycodeinone. In Interference No. 105,553, the Board of Patent Appeals and Interferences (“the Board”) granted Casner’s motion seeking judgment that Chapman claims 96-118 were unpatentable under 35 U.S.C. § 103(a). Chapman appeals, asking us to hold claims 96-118 of the '897 application nonobvious. Casner maintains that those claims were obvious, but has also lodged a cross-appeal, arguing that if we reverse the Board’s holdings as to the '897 application, we should reverse its holdings on the '966 patent and remand for a priority determination. For the reasons set forth below, we affirm the Board’s obviousness determination.
I. BACKGROUND
The '897 application is entitled “Process for Preparing Oxycodone Hydrochloride Having Less Than 25 ppm 14-Hydroxyco-deinone.” The only independent claim at issue is claim 96, which recites:
A process for preparing oxycodone or an oxycodone salt, which process comprises steps of:
(a) preparing a mixture of oxycodone, solvent and an acid;
(b) incubating the mixture under conditions suitable to promote reaction of 8, U-dihydroxy-7, 8-dihydroco-deinone to 14-hydroxycodeinone; and subsequently
(c) exposing the mixture to hydrogenation reagents under conditions sufficient for conversion of 14-hydroxyco-deinone to oxycodone.
J.A. 77 (emphases added).
Oxycodone is a synthetic analgesic opioid used to relieve pain. Typically, one prepares oxycodone by first oxidizing thebaine. This step converts thebaine into two types of compounds: 14-hydrox-ycodeinone (“14-hydroxy”) and the 8, 14-dihydroxy-7, 8-dihydrocodeinones (collectively, “8, 14-dihydroxys”). The 14-hy-droxy is converted via hydrogenation into oxycodone, which is then treated with acid during a final “salting” step to yield pharmaceutical grade oxycodone. Any 14-hydroxy remaining at the end of the reaction is problematic, as the compound is potentially toxic.
The 8, 14-dihydroxys created during the initial oxidation step are stereoisomers— *296 there are two forms, designated “8á” and an “8a,” that differ only by the relative orientation of a hydroxyl group. Chapman claims that prior to the '897 application, persons of ordinary skill in the art did not know that 8á formed during the reaction. Instead, they believed that thebaine oxidized to form 14-hydroxy and 8á, and that any 14-hydroxy remaining at the end of the reaction was leftover, unreacted 14-hydroxy. In fact, during the salting step at least one of the 8, 14-dihydroxys reacts with acid to form “new” 14-hydroxy; this 14-hydroxy can then, of course, undergo hydrogenation to become additional oxyco-done.
Chapman argues that he was the first to recognize that additional 14-hydroxy is created from 8á during the reaction’s salting step, and that the “new” 14-hydroxy can therefore yield additional oxycodone. Chapman purports to claim this method of eliminating the “new” 14-hydroxy in claim 96. The claim does not, however, differentiate between the 8á and 8á forms of 8,14-dihydroxy, nor does the claim language specifically disclose which conditions are “suitable” for promoting the desired reaction from 8, 14-dihydroxy to 14-hydroxy.
We have jurisdiction under 28 U.S.C. § 1295(a)(4)(A).
II. DISCUSSION
Obviousness is a legal conclusion based on underlying findings of fact. In re DBC, 545 F.3d 1373, 1377 (Fed.Cir.2008). We review the Board’s ultimate determination of obviousness de novo, while we review the Board’s underlying factual findings for substantial evidence. Id.
We first turn to Chapman’s arguments. Chapman claims that prior to the '897 application, no one knew that 8á was formed during thebaine oxidation. Nor, according to Chapman, was it known that 8á could react with acid under certain “commercial conditions” to form additional 14-hydroxy. Chapman admits that the prior art disclosed 8h, but claims that “under commercial oxycodone production conditions,” 8a converts into a benign salt, not into 14-hydroxy. In his view, the prior art would lead a person of ordinary skill in the art to believe that 8a must be treated with “stronger than commercially used” amounts of hydrochloric acid before it converts to 14-hydroxy.
Casner states that Chapman never claimed 8á as crucial to the invention before the Board; in other words, Chapman never tried to distinguish the prior art based on stereochemistry. Casner likewise argues that Chapman waived any “commercial conditions” limitation. Chapman responds that both issues were raised, although the stereochemistry argument is emphasized on appeal because Casner did not produce the “Proksa” reference (upon which the Board relied) until its response, leaving Chapman little opportunity to analyze and respond to the specific issues raised by that reference. Chapman also argues that since the Board identified a “commercial need” for reduced levels of 14-hydroxy, and found that a person of skill in the art would work in the “highly competitive pharmaceutical industry,” the Board understood that commercial conditions were at issue.
Chapman does not direct us to specific arguments in submissions to the Board where counsel pursued the claim that commercial conditions were necessary; nor has Chapman clarified which conditions would qualify as “commercial conditions.” Similarly, although 8á is identified in some of the '897 application’s figures, and Chapman’s expert made references to stereoisomers in reviewing the prior art, Chapman has not identified any statement before the Board that explicitly differenti *297 ated between the invention and the prior art based on stereochemistry.
Regardless, we need not resolve the waiver issue definitively. Chapman maintains, and we agree, that “[t]he term ‘8, 14-dihydroxy’ properly includes 8á, but there is no reason for that term to be limited to that isomer in Chapman’s claims. The term ‘conditions’ properly includes commercial conditions, but there is no reason to limit that term to commercial conditions in Chapman’s claims.” Appellant’s Reply Br. 27. Further, the '897 application states: “The term 8, 14-dihydroxy-7, 8-dihydrocodeinone includes either 8á, 14-dihydroxy-7, 8-dihydroco-deinone; or 8á, 14-dihydroxy-7, 8-dihy-drocodeinone or can include a mixture of both compounds.” '897 application ¶ 0043.
Thus, claim 96 merely requires one to incubate the mixture “under conditions suitable to promote reaction” of 8, 14-dihydroxy to 14-hydroxy. Therefore, pri- or art references that disclose either the 8á or 8a form of 8, 14-dihydroxy converting to 14-hydroxy, or disclose any reaction condition (whether “commercial” or not) that promotes the conversion of 8á or 8a to 14-hydroxy, may render the claim obvious. See In re May, 574 F.2d 1082, 1088-89 (C.C.P.A.1978) (“[The reference] expressly discloses ... a species within the genus of claim 1. Therefore, [the reference] is a technical anticipation of claim 1. Appellants’ assertions to the contrary notwithstanding, this finding does not constitute a new ground of rejection; lack of novelty is the epitome of obviousness.”); cf. Medichem, S.A. v. Rolabo, S.L., 353 F.3d 928, 934-35 (Fed.Cir.2003) (concluding that first step of an interference-in-fact inquiry was satisfied where two method claims had a genus/species relationship, since “ ‘[i]t is ... an elementary principle of patent law that when, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is “anticipated” if one of them is in the prior art.’ ”) (quoting Titanium Metals Corp. v. Banner, 778 F.2d 775, 782 (Fed.Cir.1985)); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed.Cir.2001) (in context of an obviousness-type double patenting analysis, noting that “[t]he only other difference between [the two method claims] is that the former is directed to humans while the latter is directed to animals,” and “[o]ur case law firmly establishes that a later genus claim limitation is anticipated by, and therefore not patentably distinct from, an earlier species claim.”).
The Board found that the prior art discloses methods under which at least one 8, 14-dihydroxy reacts to yield 14-hydroxy under certain conditions. Specifically, the Board noted that the FDA “recognized that there was a need to eliminate impurities in oxycodone,” and then proceeded to walk through the prior art, which disclosed: that both 14-hydroxy and 8, 14-dihydroxy were known impurities during the thebaine oxidation reaction; that treatment of 8, 14-dihydroxy with hydrochloric acid converts 8, 14-dihydroxy into 14-hy-droxy under certain reaction conditions; that one of skill in the art would be able to identify those conditions; and that 14-hy-droxy may be removed from oxycodone via hydrogenation.
As mentioned, claim 96 would have been obvious if properly-combinable references disclosed conditions suitable to promote reaction of 8, 14-dihydroxy to 14-hydroxy. The prior art references here do just that: they indicate that 8a, at least, will under certain reaction conditions form 14-hy-droxy. Given that claims directed to the genus (methods for eliminating 8, 14-dihy-droxys) can be anticipated or rendered obvious by references disclosing the species (methods for eliminating either the 8a *298 or 8a form of 8, 14-dihydroxy), we agree with the Board that the method described in claim 96 would have been obvious. As a result, we need not address Casner’s cross appeal.
III. CONCLUSION
For the reasons detailed above, we affirm the Board’s decision to reject claims 96-118 of the '897 application under 35 U.S.C. § 103(a).