NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

(Reexamination No. 90/008,323)

## IN RE TRANSACTION HOLDINGS LTD., LLC

---

2011-1361

---

Appeal from the United States Patent and Trademark Office, Board of Patent Appeals and Interferences.

---

## AUTOMATED TRANSACTIONS, LLC,
*Plaintiff-Appellant,*

**v.**

## IYG HOLDING CO., 7-ELEVEN, INC., VCOM FINANCIAL SERVICES, INC., AND CARDTRONICS USA, INC.,
*Defendants-Appellees.*

---

2011-1492

---

Appeal from the United States District Court for the District of Delaware in Case No. 06-CV-0043, Judge Sue L. Robinson.

_____

Decided:  April 23, 2012

_____

ALBERT L. JACOBS, JR., Tannenbaum Helpern Syracuse, of New York, New York, argued for appellant and plaintiff-appellant in appeals 2011-1361 and 2011-1492. With him on the brief was GERARD F. DIEBNER.  Of counsel on the brief was DANIEL A. LADOW, Troutman Sanders LLP, of New York, New York.

DONALD R. DUNNER, Finnegan, Henderson, Farabow, of Washington, DC, argued for defendants-appellees in appeal no. 2011-1492.  With him on the brief were KARA F. STOLL and GARTH D. BAER.

LYNNE E. PETTIGREW, Associate Solicitor, United States Patent & Trademark Office, of Alexandria, Virginia, argued for appellee in appeal no. 2011-1361  With her on the brief were RAYMOND T. CHEN, Solicitor and FRANCES M. LYNCH, Associate Solicitor.

_____

Before BRYSON, SCHALL, and PROST, _Circuit Judges_.

BRYSON, _Circuit Judge_.

These two related cases were argued together, and we address them together.  Automated Transactions, LLC, the appellant in the first case, No. 2011-1361, is related to Transaction Holdings Ltd., LLC, the appellant in the second case, No. 2011-1492.  We refer to them collectively as "ATL."

In 2006, ATL sued IYG Holding Co., 7-Eleven, Inc., and others for infringement of U.S. Patent No. 6,945,457 ("the '457 patent"). NCR Corp., which is indemnifying the defendants, then sought reexamination of the '457 patent. The infringement case was stayed pending the outcome of the reexamination.

The reexamination proceeding ended with the Board of Patent Appeals and Interferences affirming a patent examiner's rejection of seven of the claims of the '457 patent. In case No. 2011-1361, ATL has appealed the Board's order, arguing that the Board erred in finding that the claims would have been obvious in light of the prior art.

While the district court's stay was in effect, ATL obtained a number of additional patents that claimed priority to the same parent application as the '457 patent. When the stay was lifted, ATL filed an amended complaint adding four of the patents obtained during the stay to the previously asserted claims of the '457 patent. The district court subsequently granted summary judgment of noninfringement. The court ruled that the accused products—certain Vcom automated teller machines ("ATMs")—did not infringe the asserted claims of any of the five patents at issue. The court also ruled that several asserted claims of the '457 patent were invalid for indefiniteness. In case No. 2011-1492, ATL has appealed from that judgment, arguing that (1) the district court erroneously construed several claim terms, (2) the court erred in finding that the accused products do not infringe the asserted claims, and (3) the court erred in determining that several claims of the '457 patent are indefinite.

I

The patents at issue are generally directed to a method and apparatus for providing banking services and retail transactions to a consumer through an ATM that is connected to the Internet. The five patents share the same specification and have very similar claims. Independent claims 1 and 9 of the '457 patent are representative of the asserted claims. Claim 1 recites as follows:

> Integrated banking and transaction apparatus for use by a consumer, comprising:
>
> an automated teller machine; and
>
> means for providing a retail transaction to the consumer through an Internet interface to the automated teller machine.

Claim 9 recites as follows:

> A method of providing banking services and transaction capability to a consumer in a single automated transaction machine, comprising the steps of:
>
> providing automated teller machine access to the consumer via the automated transaction machine; and
>
> providing Internet access to the consumer via the automated transaction machine and realizing a retail transaction.

## II

We first address the '457 reexamination. The Board found that claims 1, 2, 5, 9, 10, and 14 would have been obvious over an article by Subrizi, et al., in view of U.S.

Patent No. 5,781,632 ("Odom"), and that claim 3 would have been obvious over Subrizi in view of Odom and a U.S. patent to Mos.[1]  ATL argues that the Board erred in finding that the asserted claims of the '457 patent would have been obvious in light of the prior art.  Subrizi is a November 1994 article that discussed problems with ATMs of that era and proposed a new prototype ATM. Odom teaches the use of encryption to send secure data over the Internet for the purpose of completing financial transactions.

In its decision affirming the examiner's obviousness rejections, the Board found that Subrizi taught the use of an ATM over "the information superhighway" to perform retail transactions.  The Board further found that while the Internet and the information superhighway might have been regarded as different entities at the time, they would have been seen as obvious alternatives to one another, especially in light of Odom's teaching that the Internet had become the information superhighway of choice.  Those findings are supported by substantial evidence.

Although Subrizi focuses principally on a redesigned user interface for ATMs, it also teaches that the described redesigned ATMs could allow customers to interact with "utility companies, credit card companies, and third party brokerage houses," as well as "support other nontraditional activities such as bill payment, purchase of airline tickets, travel reservations, and brokerage transactions." Subrizi also notes that the interface could be ported to non-traditional ATMs, and "the idea of a branded virtual

---

[1]    ATL has not separately addressed the rejection of claim 3, so that claim stands or falls with the other claims.

banking space that can be accessed from a variety of information 'ports' recasts the traditional ATM as just one public-access window into a ubiquitous financial network, an endless lattice of financial and other services that will eventually be part of the information superhighway." Odom addresses how to use encryption to send secure data over the Internet. In the "Background of the Invention" section, Odom states: "Through the years, the Internet has become the information 'superhighway' of choice for an ever increasing number of individuals who have turned to it as an inexpensive way of transmitting electronic messages and other information."

ATL's argument that the Board's findings are not supported by substantial evidence is unpersuasive. ATL disputes the effectiveness of Odom for securing transactions, but it has not put forward any evidence that persons of ordinary skill would have doubted Odom's teachings. ATL also argues that, at the time, a person having ordinary skill in the art would have viewed the Internet and the information superhighway as competitors. The evidence that ATL relies on, however, is not helpful to it. ATL cites an article by Vizard, but that article notes that "[t]he data highway model everyone is looking at is a confederation of computer networks called the Internet." According to Vizard, services to access the Internet could be "just another lane on the information highway." ATL also relies on an article by Besser, which states that the Internet and the information superhighway are "in many ways diametrically opposed models." But the article acknowledges that it was widely believed that "the Information SuperHighway will just be a faster, more powerful version of the Internet." That statement supports the conclusion that a person having ordinary skill in the art would have considered the Internet as at least an alternative to the information superhighway.

ATL also points to evidence that at the time the patent application was filed, the Internet was slow and difficult to search. But that evidence is not particularly relevant; the claimed ATMs would not need high bandwidth because ATMs transmit relatively small amounts of data, and the ATMs would not need efficient search capabilities because they would already have the addresses of the services to which they would need access. As for ATL's reliance on its expert's declarations, even he admitted that "a person of ordinary skill in the art on May 10, 1996 would have understood the phrase 'Information Superhighway' to include the Internet . . . ." Accordingly, none of the evidence relied on by ATL calls into question the Board's determinations, particularly in light of the deferential "substantial evidence" standard that applies to its factual findings.

ATL attempts to overcome the obviousness rejection by reference to secondary considerations, including commercial success. In support of its argument that the claimed invention has been commercially successful, ATL points to the success of certain Vcom ATMs, which are the same products that ATL accused of infringing its patents in the related district court litigation. The Board noted that "no evidence of a court finding of infringement has been proffered," and in appeal No. 2011-1492, we are upholding the district court's determination that the accused Vcom ATMs do not infringe the '457 patent. Because the Vcom ATMs are not embodiments of the claimed invention, their success cannot be attributed to the '457 patent. *See, e.g.*, *In re DBC*, 545 F.3d 1373, 1384 (Fed. Cir. 2008). Moreover, the Board found that ATL had failed to show that the commercial success of the Vcom products was due to their appropriation of the invention rather than to factors such as marketing and advertising, co-branding based on placement of the prod-

ucts in 7-Eleven stores, and incentives such as the waiver of certain fees. ATL has not seriously challenged those findings on appeal. Accordingly, we affirm the Board's determination that claims 1-3, 5, 9, 10 and 14 of the '457 patent would have been obvious in light of the prior art.

## III

In its appeal from the adverse judgment of the district court, ATL argues that the district court misconstrued the terms "Internet" and "Internet interface," that the court erred in granting summary judgment of noninfringement, and that the court erred in determining that several claims of the '457 patent are invalid for indefiniteness.

## A

ATL first contends that the district court adopted an incorrect definition of the term "Internet." The district court construed "Internet" to mean "a public network that is logically linked together by a globally unique address space." ATL argues that the court should have construed the term to include private networks. The term "Internet" is not used by itself in any of the claims, however. Instead, the pertinent claim terms in the patents at issue are "Internet interface," "Internet access," and "Internet connection," so we address the meaning of those terms, not the term "Internet" standing alone.

The plain language of the claims and the supporting evidence makes clear that the limitations reciting "an Internet interface to the automated teller machine," "providing Internet access to the consumer via the automated teller machine," and "an Internet interface to an Internet connection," require that the customer be able to use the ATM to access services available through the

Internet. The claims envisage an ATM having Internet access (through an Internet interface) that the customer can use to conduct both banking and other transactions, such as retail transactions. Thus, regardless of whether the Internet is defined to include private as well as public networks, it is clear from the references to the Internet interface and Internet access that the claims do not read on ATMs that are connected only to a private network and not to the Internet. The common specification confirms that point. It provides that "[t]he key to the invention is the multiple functioning of the terminal as compared to primarily single purpose devices of the prior art." '457 patent, col. 5, ll. 37-40. The "multiple functioning" refers to a host of services that the invention contemplated the ATM would be able to provide by virtue of its Internet access, such as "insurance services, restaurant services, travel services, . . . floral delivery services, . . . news services, transportation services, utility services, physician services," and many more. *Id.* at col. 3, ll. 31-36. Moreover, the inventor's deposition testimony indicates that he contemplated that customers could use the ATMs' Internet access to perform such functions as browsing the Web and checking e-mail.

The district court defined "Internet interface" to mean "Internet access" and interpreted the two terms to require that the ATM actually have an Internet connection. That construction is entirely consistent with the intrinsic record. During prosecution, the inventor used the term "Internet interface" interchangeably with "Internet connection" and "Internet access." And in distinguishing the claims containing the "Internet interface" (or "Internet access") limitation from a prior art reference, the inventor argued that the reference in question "does not teach or suggest the use of an ATM with an Internet connection to conduct retail transactions," and that in the prior art

device, a customer "never utilizes an Internet connection to realize a retail transaction." During the reexamination, ATL also equated "Internet interface" with an Internet connection or Internet access. In distinguishing a claim with the "Internet interface" limitation from prior art references, ATL argued that one reference "does not teach giving users access to the Internet through the automated teller machine," that another reference contains "no suggestion that an ATM machine connected to the Internet would allow renewal of one's driver's license," and that "nowhere is there any suggestion that a device like an ATM can have its functions expanded to include a multitude of non-banking related retail functions by being connected to the Internet." In short, the district court's construction of the term "Internet interface" is entirely sensible, and we uphold it. Moreover, although the district court did not expressly construe the terms "Internet access" and "Internet connection," we hold that those terms likewise require that the ATMs have access to retail services publicly available over the Internet and exclude ATMs that are connected only to private networks.

B

ATL argues that, even under the claim construction adopted by the district court, summary judgment of noninfringement was improper. ATL contends that the accused Vcom ATMs infringe the various patents in suit, either literally or under the doctrine of equivalents.

It appears to be undisputed that the Vcom ATMs themselves are not connected to the Internet and cannot be accessed over the Internet. The defendants provided unrebutted testimony that the Vcom ATMs conduct transactions over a fully private frame relay network, and

ATL's expert seemed to acknowledge that the Vcom ATMs are unable to browse the Web or do other tasks typically associated with Internet access. Although it is true that something can be connected to the Internet and not have Web access (for example, because it does not have a Web browser installed), the unrebutted evidence shows that the ATMs themselves are connected only to a fully private frame relay network and not to the Internet.

ATL acknowledges that the Vcom ATMs are on a private network, but it argues that a private network can still "be on the internet so long as the network has at least one publically facing address space." The evidence shows that the Vcom ATMs use a "Postilion server" to communicate over a private "Cardtronics" network, and that users cannot cause data to be sent to any computer on any network other than to the Postilion server on the Cardtronics network. ATL argues that the "Vcom system" is connected to the Internet through the "public IP address" of the Postilion server and other devices that are connected to the Vcom ATMs. The evidence that various segments of the Vcom system have IP addresses does not help ATL, however, because the unrebutted evidence shows that the accused Vcom ATMs themselves are on a private network, are not connected to the Internet, and do not have public IP addresses. The evidence further shows that even customer service employees cannot access the ATMs remotely; they can access certain information from the Cardtronics network only over a secure VPN, which can receive limited data from the network. Thus, a customer service employee's computer cannot access any of the Vcom ATMs, and the Vcom ATMs cannot access the customer service employee's computer.

ATL argues that the accused Vcom ATMs necessarily provide Internet access or have an Internet interface

because ATL's expert was able to "ping" the "Vcom system," i.e., to obtain a response from the Vcom system by sending a message to that system over the Internet.  ATL also argues that because hackers in Russia were able to hack into the Vcom system by using the Internet, Vcom ATMs must have an Internet interface and be capable of Internet access.

That evidence does not show that the Vcom ATMs infringe the asserted claims.  The fact that ATL's expert was able to ping Vcom's *system*, as opposed to Vcom *ATMs*, is meaningless.  It shows that some element of the Vcom system is on the Internet, but it does not show that any individual ATM is on the Internet, which is what the asserted claims require.

Similarly, the news article introduced by ATL to show that the Vcom system had been hacked from an outside source in Russia does not prove that the Vcom ATMs are on the Internet.  The article is not specific about the nature of the incursion, and it does not state that a Vcom ATM was hacked remotely over the Internet.  Instead, it suggests that the hackers gained access to 7-Eleven's servers through 7-Eleven's public web page, where they stole information and used it to create fake ATM cards.  To actually obtain money from the Vcom ATMs, the hackers had to go to an ATM, insert a card, and withdraw cash.  The article does not say that the hackers succeeded in accessing the Vcom ATMs remotely.  Therefore, even assuming the article to be accurate, it does not support ATL's theory of the case.

While ATL's evidence suggests that some element of the Vcom system may be on the Internet, ATL has not produced any evidence showing that the accused Vcom ATMs themselves are on the Internet.  The defendants

have provided substantial, unrebutted evidence that the accused Vcom ATMs are not on the Internet, and that a customer cannot use a Vcom ATM to send data to, or receive data from, any computer outside the private dedicated frame relay network that connects the Vcom ATMs with the Postilion server. Since the asserted claims of all five patents require an Internet interface, an Internet connection, or Internet access, ATL has not pointed to a genuine issue of material fact as to whether the accused products literally infringe the asserted claims. Accordingly, summary judgment in favor of the defendants was appropriate.

ATL is no more successful in arguing that the accused Vcom ATMs infringe under the doctrine of equivalents. The "all limitations rule" restricts the doctrine of equivalents by preventing its application when doing so would vitiate a claim limitation. *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1129 (Fed. Cir. 2008). "In determining whether a finding of infringement under the doctrine of equivalents would vitiate a claim limitation, we must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Id.*

Here, the claims expressly require a connection to the Internet. Omitting that limitation while asserting the doctrine of equivalents would violate the "all limitations rule." Moreover, this is not a case in which the accused products practice a close equivalent of the disputed limitation. A connection to a private network is substantially different from a connection to the Internet. As relevant to this appeal, most of the varied services contemplated by the patent would be unavailable to the ATM if it were

connected only to a private network. Private networks and the Internet also differ dramatically with respect to considerations such as security and simplicity of remote access. Accordingly, private networks and the Internet are not equivalents for the purposes of the patents at issue. The district court therefore correctly held that the accused Vcom ATMs do not infringe the asserted claims under the doctrine of equivalents.

## C

The final issue presented by this appeal is whether the district court correctly determined that claims 1-3 and 5 of the '457 patent are invalid for indefiniteness. In light of our decision sustaining the Board's order affirming the examiner's rejection of the asserted claims of the '457 patent (including claims 1-3 and 5) for obviousness, we need not reach the issue of indefiniteness. Accordingly, we do not address the invalidity portion of the district court's summary judgment in this case.

**AFFIRMED**