This Opinion Is a
Precedent of the TTAB

Mailed: February 11, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re ADCO Industries – Technologies, L.P.*

_____

Serial No. 87545258
Serial No. 87545533

_____

John Gregory Baker of Baker Law Firm,
    for ADCO Industries-Technologies, L.P.

Amy L. Kertgate, Trademark Examining Attorney, Law Office 113,
    Myriah Habeeb, Managing Attorney.[1]

_____

Before Mermelstein, Bergsman, and Larkin,
    Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

ADCO Industries-Technologies, L.P. (Applicant) seeks to register on the Principal

Register the marks shown below for "utility knives," in International Class 8:

1.   Application Serial No. 87545258 filed July 27, 2017, under Section 1(a) of the

     Trademark Act, 15 U.S.C. § 1051(a), based on Applicant's claim of first use

     anywhere and in commerce as of July 4, 2017.

---

[1] Odette Bonnet was the Managing Attorney when the USPTO filed its brief. She has since
retired.



Applicant describes this mark as follows:

> The mark consists of the stylized wording "TRUMP-IT" appearing in blue with the top portion of the letter "T" in "TRUMP" stylized to resemble a wave of hair, three horizontal red lines appearing below the wording "TRUMP-IT" with a blue five-point star appearing through the center of the lines, the wording "MY PACKAGE OPENER" appearing in red below the lines and star design, and the wording "MAKE OPENING PACKAGES GREAT" appearing below "MY PACKAGE OPENER". The mark appears on a transparent background.

> The color(s) Red and Blue is/are claimed as a feature of the mark.

2. Application Serial No. 87545533, filed July 27, 2017, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Applicant's claim of first use anywhere and in commerce as of July 4, 2017.



Applicant describes this mark as follows:

The mark consists of the stylized wording "TRUMP-IT" appearing in gold with the top portion of the letter "T" in "TRUMP" stylized to resemble human hair, three horizontal gold lines appearing below the wording "TRUMP-IT" with a gold five-point star appearing through the center of the lines, and the wording "MY PACKAGE OPENER" appearing in gold below the lines and star design. The mark appears on a transparent background.

The color(s) gold is/are claimed as a feature of the mark.

Applicant disclaimed the exclusive right to use the term "Package Opener" in both applications.

The Examining Attorney refused registration on the following grounds:

1.  Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that Applicant's marks falsely suggest a connection with Donald Trump;

2.  Section 2(c) of the Trademark Act, 15 U.S.C. § 1052(c), on the ground that the marks consist of or comprise a name, portrait, or signature identifying Donald Trump, a living individual, whose written consent to register is not of record; and

3.  For failing to comply with a request for information pursuant to Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b), regarding whether Applicant has a connection or relationship with Donald Trump.

These appeals present common questions of law and fact and the records are substantially similar. Therefore, in the interest of judicial economy, we consolidate the cases and decide them in this single opinion. *See In re Tapco Int'l Corp.*, 122 USPQ2d 1369, 1369 n.1 (TTAB 2017); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1214 (June 2019). We have considered all arguments and

evidence filed in each case. References to the record are to the file in Application Serial No. 87545258 unless otherwise indicated.

We reverse the refusals to register for failure to respond to the requests for information, but affirm the other refusals to register as to each application.

## I. Preliminary Issues

### A. Late-filed evidence

In its Supplemental Brief (10 TTABVUE), Applicant attempts to introduce new evidence not made of record during prosecution through an Internet link. Applicant refers to an advertisement allegedly posted at https://bustedcoverage.com.[2] There are two problems with this attempted submission. First, it was not timely filed. Evidence filed in an ex parte proceeding must be filed prior to the filing of the appeal, not afterwards. Trademark Rule 2.142(d), 37 C.F.R. § 2.142(d). Second, Applicant provided only the web address and not a copy of the webpage. Web addresses or hyperlinks are not sufficient to make the underlying webpages of record. *In re Olin*, 124 USPQ2d 1327, 1331 n.15 (TTAB 2017) (citing *In re Powermat Inc.*, 105 USPQ2d 1789, 1791 (TTAB 2013) ("Because the information displayed at a link's Internet address can be changed or deleted, merely providing a link to a website is insufficient to make information from that site of record.")); *In re HSB Solomon Assocs., LLC*, 102 USPQ2d 1269, 1274 (TTAB 2012)); TBMP § 1208.03.

To properly introduce Internet evidence into the record, an applicant must provide (1) an image of the webpage, (2) the date the evidence was downloaded or accessed,

---

[2] Applicant's Supplemental Brief, p. 15 (10 TTABVUE 16).

and (3) the complete URL of the webpage. *See In re I-Coat Co.*, 126 USPQ2d 1730, 1733 (TTAB 2018). Accordingly, we will not access or consider the advertisement allegedly posted at https://bustedcoverage.com.

## II.    Trademark Rule 2.61(b)

In the March 30, 2018 Office Action, the Examining Attorney required Applicant to "specify whether Donald Trump has any connection with applicant's goods, and if so, [Applicant] must describe the nature and extent of that connection," citing Trademark Rule 2.61(b), 37 C.F.R. § 2.61(b), as authority.[3] The failure to comply with an information requirement by itself is a sufficient ground to refuse registration. *In re Emergency Alert Sols. Grp., LLC*, 122 USPQ2d 1088, 1093 (TTAB 2017); *In re DTI P'ship, LLP*, 67 USPQ2d 1699, 1701-02 (TTAB 2003).

In its June 26, 2018 Response, Applicant "disputes that there is any false connection to President Donald Trump and reasonably minded consumers of ordinary intelligence would not presume any connection of the package openers being sold under the applied for mark … to President Donald Trump."[4] Applicant continues:

> It is not reasonable to assume that consumers would mistake that the applied for mark "TRUMP-IT MY PACKAGE OPENER MAKING [sic] OPENING PACKAGES GREAT" [sic] to that of our President Donald J. Trump. President Donald J. Trump's theme is about "Making America Great Again" and not packing [sic] opening. Consumers understand that is a play on words

---

[3] TSDR 9. Citations to the USPTO TSDR database are to the downloadable .pdf formats of the respective documents in the USPTO TSDR Case Viewer.

The Examining Attorney repeated and made final the request for information in the July 18, 2018 Office Action at TSDR 3.

[4] *Id.* at TSDR 4.

and not an association to President Donald J. Trump or President Donald J. Trump's businesses.[5]

Applicants are expected to provide direct and complete responses to a requirement for information. Examining attorneys are not expected to infer direct answers from responses that provide mere hints as to the answer. Here, while not directly responsive to the Examining Attorney's requirement for information, we find that Applicant's response makes clear that Applicant's goods do not have a connection with Donald J. Trump.

The better practice would have been for Applicant to respond directly to the Examining Attorney's requirement by expressly stating that there is no such relationship. Nevertheless, as the Examining Attorney has pointed out in her argument under Section 2(a), to the extent that there is any ambiguity in Applicant's response, the Examining Attorney and the Board may presume that the response is unfavorable to Applicant on the Section 2(a) refusal, in other words, that there is no relationship between Applicant and Donald J. Trump. *Cf. In re Cheezwhse.com Inc.,* 85 USPQ2d 1917, 1919 (TTAB 2008) ("[B]ecause applicant has inexcusably failed to provide the requested information regarding the geographic origin of its goods, our findings with respect to the substantive Section 2(e)(2) refusal include a presumption, unfavorable to applicant, that applicant's goods in fact originate or will originate in or from the place named in the mark. Similarly with respect to the alternative Section

---

[5] *Id.*

2(e)(3) refusal, we alternatively presume, unfavorably to applicant, that applicant's goods do not or will not originate in or from the place named in the mark.").

We reverse the refusal to register Applicant's marks on the ground that Applicant failed to respond to the information requirement regarding the relationship, if any, between Applicant and Donald J. Trump.

## III.   False Suggestion of a Connection

Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), prohibits registration of "matter which may … falsely suggest a connection with persons, living or dead, institutions, beliefs or national symbols." To establish a claim of false suggestion of a connection under Section 2(a), the Examining Attorney must prove:

(1) that Applicant's marks are, or are a close approximation of, Donald Trump's name or identity, as previously used by him or identified with him;

(2) that Applicant's marks would be recognized as such by purchasers of Applicant's goods, in that they point uniquely and unmistakably to Donald Trump;

(3) that Donald Trump is not connected with the goods that are sold or will be sold by Applicant under its marks; and

(4) that Donald Trump's name or identity is of sufficient fame or reputation that when used by Applicant as a mark for its goods, a connection with Donald Trump would be presumed.

*See Univ. of Notre Dame du Lac v. J.C. Food Imps. Co.*, 703 F.2d 1372, 217 USPQ 505, 509 (Fed. Cir. 1983); *In re Nieves & Nieves LLC*, 113 USPQ2d 1639, 1643 (TTAB 2015); *In re Pedersen*, 109 USPQ2d 1185, 1188 (TTAB 2013).

**A. Whether Applicant's marks are, or are a close approximation of, Donald Trump's previously used name or identity?**

"The creation of a false suggestion of a connection results from an applicant's use of something that is closely 'associated with a particular personality or 'persona'" of someone other than the applicant." *Nieves*, 113 USPQ2d at 1643 (quoting *Notre Dame*, 217 USPQ at 509); *see also In re Sauer*, 27 USPQ2d 1073 (TTAB 1993) (BO BALL falsely suggested a connection with professional football and baseball player Bo Jackson, widely known by his nickname "Bo"), *aff'd mem.*, 26 F.3d 140 (Table), 32 USPQ2d 1479 (Fed. Cir. 1994). While protection of consumers is one of the bases of this provision, another is protection of the person identified from losing the right to control his or her identity. *Notre Dame*, 217 USPQ at 509 ("There may be no likelihood of such confusion as to the source of goods even under a theory of 'sponsorship' or 'endorsement,' and, nevertheless, one's right of privacy, or the related right of publicity, may be violated.").

> The right of publicity has developed to protect the commercial interest of celebrities in their identities. Under this right, the celebrity has an interest that may be protected from the unauthorized commercial exploitation of that identity. If the celebrity's identity is commercially exploited without the consent of the celebrity, there has been an invasion of his/her right, regardless of whether his/her "name or likeness" is used. *Cf. Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 218 USPQ 1, 4 (6th Cir. 1983) (former late night television personality Johnny Carson's identity may be exploited even if his name or likeness is not used).

*Nieves*, 113 USPQ2d at 1644.

The evidence in the record establishes that Donald Trump, the President of the United States, is a well-known figure. Thus, his identity is an interest that Section

2(a) of the Trademark Act is designed to protect. *See Notre Dame*, 217 USPQ at 509 ("It is a right of this nature [that is, the right to privacy or right to publicity], a right to control the use of one's identity, which the University also asserts under § 2(a).").  Therefore, it is the right of publicity basis for the false suggestion of a connection refusal that applies in this case.

The fact that Donald Trump has never used the term "Trump-It" as his name or identity does not obviate the false suggestion of a connection refusal. A term may be considered the identity of a person even if the person has not used the term. All that is required is that the mark sought to be registered clearly identifies a person (in this case, Donald Trump). *Nieves*, 113 USPQ2d at 1644; *In re Urbano*, 51 USPQ2d 1776, 1779 (TTAB 1999) ("[W]hile the general public in the United States may or may not have seen the upcoming Olympic games referred to precisely as 'Sydney 2000,' we have no doubt that the general public in the United States would recognize this phrase as referring unambiguously to the upcoming Olympic Games in Sydney, Australia, in the year 2000.").

Therefore, in these cases, we examine the evidence of record to determine whether it establishes that Applicant's marks, shown again below, would be understood by the relevant public as identifying Donald Trump.



At the outset, the design elements of the marks call to mind Donald Trump because both marks feature Donald Trump's renowned hair wave and one mark

contains a play on Donald Trump's campaign slogan "Make America Great Again."

As stated by Applicant:

> Both have Trump's now almost iconic vision of Trump's hair wave, the patriotic color of red, white and blue on one the of [sic] applicants [sic] similar applied for marks and gold in the mark. Further, Trump's political commentary expression "making America great again" is closely related to one of the applicant's marks containing "making cutting great" or "making cutting great again."[6]

Thus, consumers will associate the marks with Donald Trump even if, as Applicant contends, "consumers will understand that 'Making America Great' by analogy to 'Making Package Opening Great' is a pun and play of words and a desire by the applicant to associate with President Donald J. Trump's theme of 'Making America [sic] Great Again' to making packing [sic] opening great."[7]

While the marks are displayed in conjunction with goods, consumers will view TRUMP-IT as referring to Donald Trump, whose companies use the name "Trump" as a trademark for goods and services. For example,

1. The Examining Attorney submitted numerous TRUMP registrations for a wide variety of goods and services,[8] including, inter alia Registration No. 4874427 for, inter alia, "bumper stickers," "posters," "pens," "clothing," and "online

---

[6] Applicant's Supplemental Brief, p. 6 (10 TTABVUE 7). *See also* "The Complete Evolution of Donald Trump's Hair," September 9, 2015, Buzzfeed.com (March 30, 2018 Office Action at TSDR 31); "The 100 greatest descriptions of Donald Trump's hair ever written," June 17, 2016, ChicagoTribune.com (March 30, 2018 Office Action at TSDR 46).

[7] Applicant's Supplemental Brief, p. 4 (10 TTABVUE 5).

[8] October 16, 2017 Office Action (TSDR 224-258).

social networking services in the field of politics,"[9] Registration No. 3563198

for "chairs, couches, loveseats, and ottomans,"[10] Registration No. 4276258 for

"desk accessories," "glasses, cups, bowls, decanters; beverage glassware,"[11] and

Registration No. 4325053 for "wine," and "vineyard and winery services.[12]

2. Trump Home website (trumphomecollection.com) advertises that

> Inspired by the world-renowned Trump Brand, the Trump Home® Collection is designed to offer the consumer exquisite handcrafted furnishings with high-style and custom quality.
>
> TRUMP HOME COLLECTION – HAND CRAFTED LUXURY FURNITURE
>
> HIGH END FURNITURE INSPIRED BY THE TRUMP LIFESTYLE.[13]

3. The Trump Store website (trumpstore.com) advertises numerous TRUMP

brand products.[14] Representative samples of products are shown below:

---

[9] *Id*. TSDR 256. The registrant is DTTM Operations LLC. The registration includes the statement that "The name(s), portrait(s), and/or signature(s) shown in the mark identifies Donald J. Trump, a living individual whose consent is of record."

[10] *Id*. at TSDR 229. The registrant is DTTM Operations LLC.

[11] *Id*. at TSDR 238. The registrant is DTTM Operations LLC.

[12] *Id*. at TSDR 244. The registrant is Trump Wine Marks LLC. Trump Wine Marks LLC is located at the same address as DTTM Operations LLC (725 Fifth Avenue, New York, New York).

[13] July 18, 2018 Office Action (TSDR 18).

[14] *Id*. at TSDR 20-36. The Trump Store website provides links for Trump.com, Trump Hotels, Trump Golf, Trump International Reality, and Trump Winery. *Id*. at TSDR 22.



On The Go Charger
$20.00

Trump Hotels Classic
Stick Umbrella
$20.00

YETI Rambler 20 oz.
Tumbler
$50.00

Traditional Winter Hat –
Red/Navy
$32.00

4. The Trump Winery website (trumpwinery.orderport.net) advertises the sale of TRUMP wine, glassware, apparel and gifts, including a TRUMP bottle opener shown below.[15]



5. The Trump name appears on buildings owned by Donald Trump and his companies.[16]



---

[15] *Id.* at TSDR 37-48.

[16] March 30, 2018 Office Action (TSDR 17).

6. Forbes magazine website (forbes.com), "Donald Trump's Real Secret To Riches: Create a Brand and License It," (November 24, 2015), reports how Donald Trump licenses the Trump name[17] and how "the Trump name attracts buyers."[18] According to the author, "[m]oney from licensing the Trump name makes up an increasing share of Donald Trump's wealth."[19] Bloomberg Politics estimates Trump's licensing revenues between $32 million and $55 million.[20]

> The Trump name is associated with glamour and swashbuckling business dealings, but it's also associated with overspending, debt, and disappointed investors.[21]

7. Motley Fool website (fool.com), "Donald Trump's Name is Everywhere - - But What Does He Actually Own?" (November 17, 2016), reports that Donald Trump "makes money through licensing his name,"[22] and that his "singular asset is his name."[23]

> The Trump brand has appeared on everything from steaks to vodka, hotels, golf courses, residential buildings, his ill-fated university, casinos, and a whole lot more.
>
> \*　　\*　　\*
>
> Licensing actually makes up the biggest single source of revenue for the president elect's company. Trump has always been a bit elusive in showing people what he's actually worth but in 2014 he claimed "real estate licensing

---

[17] *Id.* at TSDR 184.

[18] *Id.* at TSDR 185.

[19] *Id.*

[20] *Id.* at TSDR 186.

[21] *Id.* at TSDR 188.

[22] *Id.* at 190.

[23] *Id.* at 192. The author reports that "an exhaustive examination of [Trump's] licensing deals by "The Real Deal" in 2013 found that [Trump's] brand was worth $4 billion." *Id.*

deal[s], brand and branded developments" were worth more than $3.3 billion, of the $8.7 billion in total net worth he stated he had at the time.[24]

8. The Washington Post (washingtonpost.com), "How Trump has made millions by selling his name" (January 25, 2017), based on a review of Donald Trump's 2015 and 2016 financial disclosures, reports that Donald Trump has licensed his last name to at least 50 different licensing or management deals.[25]

We find that Applicant's marks, considered in their entireties, are a close approximation of Donald Trump's previously used name or identity because the marks' design elements and wording evoke Donald Trump. Additionally, while it is not required to show that the person named in the mark is connected with goods or services or has had his or her name used in connection with goods or services, the fact that Donald Trump is associated with numerous goods and services further supports a finding that consumers would view Applicant's marks as a close approximation of his name or identity. The record shows that Donald Trump, through his companies, has extensively licensed the sale of a variety of TRUMP branded products and American media reports that Donald Trump extensively licenses his name for a variety of goods and services, such that the American public would be aware of and encounter TRUMP branded goods and services. *See Nieves*, 113 USPQ2d 1639 (ROYAL KATE falsely suggests a connection with Catherine Duchess of Cambridge, also known as Kate Middleton); *Urbano*, 51 USPQ2d 1776 ("Sydney 2000" falsely

---

[24] *Id.* at 190.

[25] *Id.* at 195.

suggests a connection with the Olympic Games in Sydney, Australia, in the year 2000."); *Sauer*, 27 USPQ2d 1073 (BO BALL falsely suggests a connection with professional football and baseball player Bo Jackson, widely known by his nickname "Bo"); *Buffett v. Chi-Chi's, Inc.*, 226 USPQ 428 (TTAB 1985) (evidence that term, "Margaritaville," is so closely associated in public mind with public persona of Jimmy Buffett as to be synonymous with, and almost nickname of, Jimmy Buffett is sufficient to raise genuine issue of material fact as to whether "Margaritaville" is so uniquely and unmistakably associated with Jimmy Buffett as to constitute his name or identity such that when applicant's mark MARGARITAVILLE is used in connection with its services, connection with Jimmy Buffett would be assumed).

**B. Whether Applicant's marks would be recognized as such by purchasers of Applicant's goods, in that they point uniquely and unmistakably to Donald Trump?**

Applicant seeks to register its marks for utility knives. As noted above, Donald Trump, through his companies, has licensed the sale of TRUMP furniture, electronic device chargers, umbrellas, tumblers, winter hats, wine, and bottle openers. Some of the other products bearing the TRUMP trademark include

1. T-shirts;[26]

2. Flags;[27]

3. Photo buttons;[28]

---

[26] July 18, 2018 Office Action (TSDR 5).

[27] *Id.* at 7.

[28] *Id.*

4. Megaphones;[29]

5. Hats;[30]

6. Mugs;[31]

7. Duffle bags, travel bags, brief cases, luggage tags, dog collars, pet bandanas, and pet leashes;[32]

8. Playing cards, teddy bears, key chains, and magnets; [33] and

9. Coffee.[34]

Based on this evidence, we find that consumers encountering utility knives bearing Applicant's mark, shown below,[35] will perceive Applicant's utility knives to be just one more product for which Donald Trump has licensed the use of his name.



---

[29] *Id.*

[30] *Id.* at 11 and 26.

[31] *Id.* at 13.

[32] *Id.* at 20-30.

[33] *Id.* at 31-33.

[34] *Id.* at 38.

[35] Applicant's specimen of use filed with the applications.



As a private citizen, Donald Trump operated under a business model where he leveraged his name as a brand on a wide variety of diverse products. *See, e.g., Philip Morris Inc. v. K2 Corp.*, 555 F.2d 815, 194 USPQ 81, 82 (CCPA 1977) ("[C]onsumers would be more likely to make an assumption of common source or sponsorship than would otherwise be the case" where "Appellant is a diversified company in an industry apparently known for its diversification"); *Owens-Illinois Glass Co. v. Clevite Corp.*, 324 F.2d 1010, 139 USPQ 505, 506 (CCPA 1963) (under section 2(d), confusion as to source more likely when the senior user offers a wide variety of goods under the mark); *see generally In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (ninth factor in assessing the degree of consumer confusion is the variety of goods on which the mark is used, e.g., house mark).

Since becoming a candidate for the presidency and subsequently being elected President of the United States, the U.S. media has focused its attention on Donald Trump's businesses. The record establishes that consumers will recognize Applicant's marks, featuring the Trump name together with what Applicant calls the "almost iconic" hair wave,[36] as pointing uniquely and unmistakably to Donald Trump.

---

[36] Applicant's Supplemental Brief, p. 6 (10 TTABVUE 7).

### C. Whether Donald Trump is connected with the goods that are sold or will be sold by Applicant under its marks?

As discussed above, Applicant argued "reasonably minded consumers of ordinary intelligence would not presume any connection" between Donald Trump and utility knives. We construe that as an admission that Donald Trump has no connection to the utility knives that Applicant sells or to Applicant itself.

### D. Whether Donald Trump's name or identity is of sufficient fame or reputation that when used by Applicant as a mark for its goods, a connection with Donald Trump would be presumed?

To its credit, Applicant concedes that Donald Trump "has tremendous amazing worldwide fame" and "has such immense worldwide fame to all corners of the globe."[37] In addition, as discussed above, Donald Trump as a private citizen has made a business of licensing his name on a multitude of products. Further, subsequent to Trump's election to the presidency, the media has shined a spotlight on that business practice. Thus, when consumers encounter utility knives displaying Applicant's marks with the Trump name together with the "almost iconic vision of Trump's hair wave" as well as a play on his "Make America Great Again" campaign slogan, they will presume that there is a connection with Donald Trump.

### E. Analyzing the factors.

Considering all of the evidence of record before us, we find that (i) Applicant's marks are a close approximation of Donald Trump's name and identity; (ii) Applicant's marks point uniquely and unmistakably to Donald Trump; (iii) Donald

---

[37] Applicant's Supplemental Brief, p. 5 (10 TTABVUE 6).

Trump has no connection with Applicant; and (iv) Donald Trump's name and identity is of sufficient fame and reputation that when Applicant's marks are used on utility knives, a connection with Donald Trump would be presumed. Therefore, we find that the Examining Attorney established that Applicant's marks for utility knives falsely suggest a connection with Donald Trump.

## IV. Whether Applicant's Marks identify Donald Trump without his written consent?

Section 2(c) of the Trademark Act, 15 U.S.C. § 1052(c), provides the following:

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it … (c) Consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent, or the name, signature, or portrait of a deceased President of the United States during the life of his widow, if any, except by the written consent of the widow.

A key purpose of requiring the consent of a living individual to the registration of his or her name, signature, or portrait is to protect rights of privacy and publicity that living persons have in the designations that identify them. *In re Hoefflin*, 97 USPQ2d 1174, 1176 (TTAB 2010); *Martin v. Carter Hawley Hale Stores, Inc.*, 206 USPQ 931, 933 (TTAB 1979) (Section 2(c) was designed "to protect one who, for valid reasons, could expect to suffer damage from another's trademark use of his name."). *See also Notre Dame*, 217 USPQ at 509 n.8; *Canovas v. Venezia 80 S.R.L.*, 220 USPQ 660, 661 (TTAB 1983).

Whether consent to registration is required depends on whether the public would recognize and understand the mark as identifying a particular living individual. A

consent is required only if the individual bearing the name in the mark will be associated with the mark as used on the goods or services, either because: (1) the person is so well known that the public would reasonably assume a connection between the person and the goods or services; or (2) the individual is publicly connected with the business in which the mark is used. *See Hoefflin*, 97 USPQ2d at 1175-76; *Krause v. Krause Publ'ns, Inc.*, 76 USPQ2d 1904, 1909-10 (TTAB 2005); *Sauer*, 27 USPQ2d at 1075; *Carter Hawley Hale Stores*, 206 USPQ at 933.

For purposes of Section 2(c), a "name" does not have to be the full name of an individual. Section 2(c) applies not only to full names, but also first names, surnames, shortened names, pseudonyms, stage names, titles, or nicknames, if there is evidence that the particular name identifies a specific living individual who is publicly connected with the business in which the mark is used, or who is so well known that such a connection would be assumed. *See Hoefflin*, 97 USPQ2d at 1177-78 (holding registration of the marks OBAMA PAJAMA, OBAMA BAHAMA PAJAMAS, and BARACK'S JOCKS DRESS TO THE LEFT barred under Section 2(c) in the absence of consent to register, because they create a direct association with President Barack Obama); *Krause v. Krause Publ'ns, Inc.*, 76 USPQ2d at 1909 ("[T]he mark KRAUSE PUBLICATIONS, although it includes only the surname of petitioner, would fall within the provisions of Section 2(c) if petitioner establishes that KRAUSE, as used on or in connection with the goods or services set forth in the involved registration, points uniquely to him 'as a particular living individual.'"); *Sauer*, 27 USPQ2d at 1074-75 (holding registration of a mark containing BO, used in connection with a

sports ball, barred under Section 2(c) in the absence of consent to register, because BO is the nickname of a well-known athlete and thus use of the mark would lead to the assumption that he was associated with the goods); *John Anthony, Inc. v. Fashions by John Anthony, Inc.*, 209 USPQ 517, 525 (TTAB 1980) ("[W]hen a name or pseudonym has come to be recognized in a certain field of business as identifying a particular living individual, the individual possesses a valuable property right in that name, and the courts will not allow the name to be appropriated or commercially exploited by another without his consent.").

While with lesser-known figures there may have to be evidence showing that the consuming public connects them with the manufacturing or marketing of the goods at issue, well-known individuals such as celebrities and world-famous political figures are entitled to the protection of Section 2(c) without having to evidence a connection with the involved goods or services. *See Hoefflin*, 97 USPQ2d at 1177 (because Barack Obama was the President of the United States, the purchasing public would reasonably assume that marks consisting of the names BARACK and OBAMA identify him); *In re Masucci*, 179 USPQ 829, 830 (TTAB 1973) (in spite of any common law rights applicant may have, EISENHOWER for greeting cards was refused on the ground that it consisted of the name of the late President Eisenhower during the life of his widow, and application for registration was filed without her consent).

As we found in our analysis of whether Applicant's marks create a false suggestion of a connection with Donald Trump, Applicant's marks featuring the term TRUMP-

IT together with the "almost iconic vision of Trump's hair wave" identify Donald Trump, whose identity is renowned. By any measure, and as Applicant readily admits, Donald Trump is a well-known political figure and a celebrity. Thus, we find that Applicant's marks include Donald Trump's name and likeness and because the application does not include Donald Trump's written consent to the use and registration of his name and likeness, the Section 2(c) refusal to register is affirmed.

## V.    Constitutionality Arguments

Applicant devotes much of its appeal brief to arguing that Sections 2(a) and 2(c) of the Trademark Act, 15 U.S.C. §§ 1052(a) and (c), are unconstitutional because they violate the First Amendment to the Constitution. Previously, the Board has stated that it has no jurisdiction or authority to pass on the constitutionality of federal statutes. *See In re Dist. of Columbia*, 101 USPQ2d 1588, 1602 (TTAB 2012) (no authority to declare provisions of the Trademark Act unconstitutional), *aff'd sub nom. In re City of Hous.*, 731 F.3d 1326, 108 USPQ2d 1226 (Fed. Cir. 2013); *Blackhorse v. Pro-Football Inc.*, 98 USPQ2d 1633, 1638 (TTAB 2011) (no authority to rule on the constitutionality of the Trademark Act on its face or as applied); *Harjo v. Pro-Football, Inc.*, 50 USPQ2d 1705, 1710 (TTAB 1999) (no authority to declare provisions of the Trademark Act unconstitutional nor to determine whether Trademark Act 2(a) is overbroad or vague), *rev'd on other grounds*, 284 F. Supp. 2d 96, 68 USPQ2d 1225 (D.D.C. 2003), *rev'd on other grounds*, 415 F.3d 44 (D.C. Cir. 2005).

While the Trademark Trial and Appeal Board is an administrative tribunal, not an Article III court, and is not empowered to strike down a statute as contrary to the Constitution, recent case law suggests that administrative agencies of the executive

branch of the federal government can address constitutional questions. *See In re DBC*, 545 F.3d 1373, 89 USPQ2d 1123, 1127-28 (Fed. Cir. 2008) (requiring a party to raise a constitutional challenge to the agency "gives [the] agency an opportunity to correct its own mistakes … before it is haled into federal court," and "it promotes judicial efficiency, as '[c]laims generally can be resolved much more quickly and economically in proceedings before [the] agency than in litigation in federal court'") (alterations in original) (quoting *Woodford v. Ngo*, 548 U.S. 81, 89 (2006)). Even where an agency "lacks authority" to address or "refused to pass upon the constitutionality of legislation," a constitutional challenge may involve "many threshold questions . . . to which the [agency] can apply its expertise." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 16, 22-23 (2012). This is particularly true where "the challenged statute" is "one that the [agency] regularly construes," in which case "its statutory interpretation could alleviate constitutional concerns" or otherwise shed light on a constitutional question eventually brought to the Supreme Court. *Id.*

Here, for example, Applicant argues that refusal of the registration based on violations of Section 2(a)'s false suggestion of a connection clause and Section 2(c) is an impermissible restriction of Applicant's right to free speech protected under the First Amendment. At minimum, in addressing a constitutional challenge, an agency may properly address the statutes it administers, and thus we briefly explain why we do not agree with Applicant's challenges based on our experience with Section 2 of the Trademark Act and the purposes underlying it. *See Elgin*, 567 U.S. at 23 (holding that even if the precise constitutional issue could not be squarely addressed before

the administrative body, at the least the agency's "expertise" in its own procedures and the statutes it regularly applies can "be 'brought to bear'" on those questions) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 214-15 (1994)).

As an initial matter, Applicant errs in treating provisions of the Lanham Act that limit the universe of marks eligible for the benefit of federal trademark registration as akin to direct restrictions on speech. Section 2 of the Lanham Act does not prevent an applicant from using any slogan of its choice on its merchandise or from advertising that merchandise through any advertising message of its choosing. Section 2 says only that the mark itself must meet certain criteria in order to be registrable.

While the Supreme Court recently struck down provisions in Section 2(a) on the grounds that they were viewpoint discriminatory, the Supreme Court pointedly refrained from extending its holdings to any provisions of the Lanham Act that do not discriminate based on the applicant's viewpoint. *See, e.g.*, *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 n.*, 2019 USPQ2d 232043, ___ (2019) ("Nor do we say anything about how to evaluate viewpoint-neutral restrictions on trademark registration."); *see also id.* at 2303 (Alito, J., concurring) (emphasizing that the Court's holding turned entirely on the conclusion that the invalidated provision was viewpoint discriminatory and noting that Congress could adopt a more narrowly tailored restriction that rendered certain types of content ineligible for registration). Notably, the provisions challenged here are viewpoint neutral.

In any case, the challenged provisions withstand review even when evaluated as restrictions on speech. Section 2(a)'s "false suggestion" clause prohibits registration of any trademark that "Consists of or comprises … matter which may … falsely suggest a connection with persons, living or dead." This clause recognizes the right of privacy and publicity that a living person has in his/her identity and protects the public by targeting marks that may mislead the public into thinking that the source of the marks is connected with a particular person.

It is well-settled that "[t]he government may ban forms of communication more likely to deceive the public than inform it ...." *Cent. Hudson Gas & Elec. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563 (1980). Unlike the disparagement clause found unconstitutional in *Matal v. Tam*, 137 S. Ct. 1744, 122 USPQ2d 1757 (2017), or the immoral or scandalous clause struck down in *Brunetti*, the false suggestion clause directly furthers the goal of prevention of consumer deception in source-identifiers. Congress acts well within its authority when it identifies certain types of source-identifiers as being particularly susceptible to deceptive use and enacts restrictions concerning them. *Cf. S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 3 USPQ2d 1145, 1153 (1987) ("Congress reasonably could conclude that most commercial uses of the Olympic words and symbols are likely to be confusing.").

The same goes for Section 2(c). It prohibits registration of any mark that "[c]onsists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent." Like the false association clause, Section 2(c) recognizes the right of privacy and publicity that a living person has in

his or her identity and protects consumers against source deception. Marks prohibited registration from under Section 2(c) are those which are likely to be associated with a particular person "either because that person is so well known that the public would reasonably assume the connection or because the individual is publicly connected with the business in which the mark is used." *Gilbert/Robinson, Inc. v. Carrie Beverage-Mo., Inc.*, 989 F.2d 985, 26 USPQ2d 1378, 1380 (8th Cir. 1993) (citing *Carter Hawley Hale Stores*, 206 USPQ at 933); *see also Hoefflin*, 97 USPQ2d at 1175-76. Such a prohibition, not on use, but only on registration, is comfortably within Congress's authority to protect the public against misleading or deceptive source-identifiers, and thus stands outside the speech rights protected by the First Amendment.

We therefore reject Applicant's constitutional challenges.

**Decision:** The refusal to register Applicant's marks under Trademark Rule 2.61(b) is reversed, but the refusals to register Applicant's marks under Sections 2(a) and 2(c) of the Trademark Act are affirmed.